Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

**FILED - GR**
June 11, 2021 11:45 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: tb  SCANNED BY: TB 6/14/21

# UNITED STATES DISTRICT COURT
for the
Western District of Michigan

_Southern_ Division

**1:21-cv-488**
Robert J. Jonker - Chief U.S. District Judge
Ray Kent - Magistrate Judge

Gamalier Gonzalez and E.G. (minor child) )
& Anna Gonzalez )
)
_____ )
*Plaintiff(s)* )
*(Write the full name of each plaintiff who is filing this complaint.* )
*If the names of all the plaintiffs cannot fit in the space above,* )
*please write "see attached" in the space and attach an additional* )
*page with the full list of names.)* )
-v- )
)
YMCA USA )
)
_____ )
*Defendant(s)* )
*(Write the full name of each defendant who is being sued. If the* )
*names of all the defendants cannot fit in the space above, please* )
*write "see attached" in the space and attach an additional page* )
*with the full list of names.)* )

Case No. _____
*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)*  ☑ Yes  ☐ No

# COMPLAINT FOR A CIVIL CASE

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Gamalier Gonzalez and E.G. (minor child) & Anna Gonzalez |
| Street Address | 6895 Cannonsburg Rd. NE |
| City and County | Belmont, Kent County |
| State and Zip Code | Michigan, 49306 |
| Telephone Number | 616-401-1288 |
| E-mail Address | gamalierg@gmail.com |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Page 1 of 5

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1
- Name: YMCA USA
- Job or Title *(if known)*:
- Street Address: 101 N. Wacker Drive
- City and County: Chicago, Cook County
- State and Zip Code: Illinois, 60606
- Telephone Number: 800-872-9622
- E-mail Address *(if known)*:

Defendant No. 2
- Name:
- Job or Title *(if known)*:
- Street Address:
- City and County:
- State and Zip Code:
- Telephone Number:
- E-mail Address *(if known)*:

Defendant No. 3
- Name:
- Job or Title *(if known)*:
- Street Address:
- City and County:
- State and Zip Code:
- Telephone Number:
- E-mail Address *(if known)*:

Defendant No. 4
- Name:
- Job or Title *(if known)*:
- Street Address:
- City and County:
- State and Zip Code:
- Telephone Number:
- E-mail Address *(if known)*:

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☐ Federal question          ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A. If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

### B. If the Basis for Jurisdiction Is Diversity of Citizenship

1. The Plaintiff(s)

   a. If the plaintiff is an individual
      The plaintiff, *(name)* Gamalier Gonzalez and E.G. (minor child) & Anna Gonzalez, is a citizen of the State of *(name)* Michigan.

   b. If the plaintiff is a corporation
      The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____,
      and has its principal place of business in the State of *(name)* _____.

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

   a. If the defendant is an individual
      The defendant, *(name)* _____, is a citizen of the State of *(name)* _____. Or is a citizen of *(foreign nation)* _____.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

    b.    If the defendant is a corporation

The defendant, *(name)* YMCA USA, is incorporated under the laws of the State of *(name)* Illinois, and has its principal place of business in the State of *(name)* Illinois.

Or is incorporated under the laws of *(foreign nation)* _____,

and has its principal place of business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

The defendant failed to accommodate minor child E.G. due to his disability (Spinal Muscular Atrophy Type II) after accepting him into the Day Camp program, leaving plaintiff Gamalier Gonzalez unable to financially provide during the period that E.G. had been expecting to attend the camp.

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

See attached document

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Measurable Damages: $102,389.35
Breakdown:
Estimated lost wages - Gamalier $60,000.00
Estimated cost of newer (used) wheelchair van - $35,000.00+
Estimated cost of basic repairs on current wheelchair van - $2,580.24
Cost of patient lift - $4,809.11

Unknown/ unquantifiable costs: Gamalier's physical health from regularly lifting E.G. weighing 100+ lbs.; E.G.'s mental health due to the rejection and loss of emotional and social interactions

## V.     Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:   6-10-2021

Signature of Plaintiff   *Gamalier Gonzalez   Anna Gonzalez*
Printed Name of Plaintiff   Gamalier Gonzalez   Anna Gonzalez

### B.     For Attorneys

Date of signing:

Signature of Attorney
Printed Name of Attorney
Bar Number
Name of Law Firm
Street Address
State and Zip Code
Telephone Number
E-mail Address

E.G. has Spinal Muscular Atrophy (SMA) Type II, a degenerative disease caused by a lack of the SMN protein in his DNA. This lack of SMN causes his muscles to atrophy, and E.G. has never been able to walk and utilizes a power wheelchair. He requires help with hygiene and restroom needs, but he can do just about everything else for himself with the help of his wheelchair, including feeding himself when food is in front of him. SMA does not affect the mind and E.G. is bright, witty, friendly, and outgoing.

In May of 2018, Gamalier and his fiancée (now wife) Anna Lane (now Anna Gonzalez) applied 10-year-old E.G. to the day camp program of the Mary Free Bed YMCA (located in Grand Rapids, Michigan), a completely accessible complex without a stair in the building designed in the spirit of Mary Free Bed Rehabilitation, a local hospital and rehab clinic focused on people with disabilities. After extensive phone and email conversations (May 22, 2018) with the Senior Program Development Director, David Leggett, about E.G.'s patient lift/ related bathroom needs and whether they could accommodate this, Mr. Leggett accepted E.G. into the program and assured Ms. Lane that it was not a problem and the YMCA would figure it out. Mr. Leggett stated at that time that he was looking into getting a lift at the location for E.G., but that they already had one Hoyer lift onsite that was an option. Mr. Leggett and Ms. Lane discussed the need for a table or bed in the restroom to be able to pull his pants down, as it is impossible for a care provider to do so from his wheelchair or Hoyer lift. Mr. Leggett let Ms. Lane know that there were a few accessible bathrooms there with built-in beds in the room. At that point, Ms. Lane and Mr. Gonzalez were satisfied that the Mary Free Bed YMCA being architecturally designed for wheelchair users was a good choice for E.G.

Ms. Lane tried to contact Mr. Leggett a few more times to set up a time to train someone how to help E.G. in the restroom, but he was on vacation the last week of May 2018 and did not return Ms. Lane's calls on his return. Camp orientation was June 6, 2018. Ms. Lane brought E.G. to camp orientation with her, where they met the director and other camp administrative personnel. Ms. Lane asked the director if they should set up a training session before the start of camp, but he did not seem concerned and asked Ms. Lane to come in on the first day of camp and plan on showing E.G.'s counselors at that time. Mr. Leggett asked one of the staff to show Ms. Lane the lift/ bathroom "bed" set up. Ms. Lane was satisfied with those devices.

When Ms. Lane arrived with E.G. on the first day of camp, Monday June 11, 2018, everything seemed fine. Ms. Lane showed E.G.'s main counselor how the lift worked. She was attentive and asked good questions. However, when they went to lift E.G. from his chair to the "bed," it became apparent that Ms. Lane had overlooked the detail that there was no space for the lift to slide underneath the bed (it was tiled to the floor), so the lift would not be able to safely set him down on it. The counselor and Ms. Lane went to report this dilemma to the camp director, but he was not in the office yet, so they explained the issue to the operations manager (Ms. Staci Chambers). Ms. Lane suggested obtaining a Physical Therapy table perhaps on loan from the Mary Free Bed Rehab Hospital. Though Ms. Chambers did not immediately suggest a solution, she did state that they would work on it and figure something else out as soon as possible. Ms. Lane and Ms. Chambers agreed that in the meanwhile, Ms. Lane would return at 10:30 am to take E.G. to the restroom and speak with the Camp Director, Mr. David Leggett, at that time. When Ms. Lane returned, Mr. Leggett told Ms. Lane that there may be an issue with the YMCA's liability when it came to E.G.'s toileting needs. Mr. Leggett stated that he was "unaware that someone actually had to pull E.G.'s pants down" and that they were not allowed to touch any of the children for risk of "being accused of inappropriate touching." While Ms. Lane was completely caught off guard, she did manage to directly ask him, "what exactly does that mean? Is my son not going to be able to come here?" It was at that point that Mr. Leggett told Ms. Lane he was not sure and that he had placed a call to their consultant to determine what they were and were not allowed to do and he was waiting for a call back. Mr. Leggett then excused himself abruptly and Ms. Lane was not able to connect with him again, nor was he present for any meeting or discussion after that.

Ms. Lane went back on her lunch hour to check on E.G., and at that point, Ms. Chambers informed Ms. Lane of the full details of what information they were waiting for from their consultant. Ms. Chambers was not even sure that E.G. could come back the next day, and that Ms. Lane needed to "figure out a Plan B" because E.G. would not be able to come back until the consultant advised if it was acceptable. Ms. Lane was incredibly upset at that point, and she could tell E.G., who was present for the entire conversation, was feeling uncomfortable. Moreover, the YMCA directors could not provide a solution for the day except for Ms. Lane to return to take care of E.G.'s bathroom needs, so Ms. Lane removed him from the Day Camp for the day.

Later that day, the consultant decided that they could not accept E.G. in the Day Camp program. Mr. Gonzalez, who was at work and had only been privy to one phone conversation thus far about the whole situation, traveled to the Mary Free Bed YMCA from his worksite to get up to speed on this newest development and to discuss options to keep E.G. at the camp. Despite advising the family that E.G. would not be able to attend, YMCA agreed to provide care for E.G. for Tuesday, June 12 and Wednesday, June 13, but further care or other options would be decided at an upcoming meeting on Wednesday that included the Gonzalez family and administrative staff. E.G. did not go to the bathroom or request assistance the entire day on June 12 or 13 because he was uncomfortable asking for it after the toxic conversations surrounding his needs. He was made to feel like a burden to the staff, and he had lost all trust that they would do what was in his best interest.

That Wednesday evening, June 13, 2018, there was a meeting that included Mr. Gamalier Gonzalez, Ms. Anna Lane, the District Executive Director (Paul Petr), the Operations Manager (Staci Chambers), and an additional administrative staff member (Ashley [last name unknown]) who seemed knowledgeable of the specifics of their policies. They informed the Gonzalez family that caring for E.G. would throw off their staff-to-student ratios (even though they had announced at orientation that there were still many openings for more children, implying that they were nowhere close to capacity of their ratios). They further said they would only be able to care for him if Ms. Lane was able to come to the facility and take him to the bathroom whenever he needed to go. The Gonzalez family said this was not an option and expressed concern that they would even suggest this – besides the fact of how it would interfere with Ms. Lane's work schedule, it would risk E.G.'s safety and dignity if Ms. Lane could not arrive in time for him to use the facilities. At the end of the meeting when no solution had been reached, Ashley suggested to the Gonzalez family other options for care that were unrealistic, unaffordable, and did not solve the issue of E.G. being at the YMCA Day Camp.

The entire Gonzalez family at this point were all experiencing both mental and physical symptoms of stress. No "Plan B" was anticipated and at that late point into the start of summer, there were no more facilities that would even have openings left for E.G. As a result of lack of accommodation, E.G. lost valuable social and emotional stimulation, and had already even met new friends at the YMCA Day Camp. Mr. Gonzalez was forced to give up a promising career and a lucrative summer of work and stay home to be able to care for the needs of his son. This led to financial strain for the entire family, including an inability to purchase a patient lift for E.G.'s home use, the inability to fully repair E.G.'s wheelchair van to be able to sell it, and the inability to afford a sorely needed newer model wheelchair van, all of which the Gonzalez family planned to accomplish that summer.

Despite accepting E.G. into the program weeks prior to its start, accepting payments for the entire summer of Day Camp, providing a lift and bed for his restroom needs, and training a counselor to help him in the restroom, they subsequently rejected him and refused to provide reasonable accommodations that could easily have been provided by a non-medical layperson staff. They had adequate equipment on site and even trained staff to assist E.G., but the YMCA was unwilling to provide those accommodations.